Gustave P. Passanante, Esq.
Catherine Gretschel, Esq.
**THE BASILE LAW FIRM P.C.**
**390 North Broadway, Suite 140**
**Jericho, NY 11753**
Tel.:    (516) 455-1500
Fax:    (631) 498-0748
Email: gus@thebasilelawfirm.com
          cat@thebasilelawfirm.com

*Attorneys for Plaintiff VNUE, Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VNUE, INC., | **COMPLAINT** |
|                            **Plaintiff,** | **CIVIL ACTION NO. 2:21-cv-05545** |
|          **v.** | **JURY TRIAL DEMANDED** |
| **POWER UP LENDING GROUP, LTD.,** and **CURT KRAMER.** | |
|                       **Defendants.** | |

Plaintiff VNUE, Inc. ("VNUE" or "Plaintiff"), through undersigned counsel, states as follows for its Complaint against Defendant, Power Up Lending Group Ltd. ("Power Up"), and Defendant Curt Kramer ("Kramer," and together with Power Up, the "Defendants").

## SUMMARY

1.      Power Up is a "death spiral" or "toxic" lender:[1] an unregistered securities dealer that engages in convertible market adjustable securities transactions with small public

---

[1]    *See*    https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities    (last accessed October 5, 2021); https://en.wikipedia.org/wiki/Death_spiral_financing (last accessed October 5, 2021).

companies—businesses that are often struggling to raise capital.[2]  Toxic lenders like Power Up are not the savior of microcaps that they purport to be, nor is their business model legal because they are an unregistered dealer.  Rather, as reflected in recent Securities and Exchange Commission ("SEC") prosecutions,[3] lenders like Power Up avoid registering so they can evade regulatory oversight and thereby make predatory loans that generate outrageous profits.

2.      The toxic lending business model is simple: unlike an investor or day trader, the lender uses the loan transaction to acquire the company's stock at a steep discount[4] (on top of the formal loan interest), which it then dumps into the public markets as soon as possible, invariably causing a catastrophic plunge in the stock price.

3.      From at least 2015 through the present, Kramer and Power Up[5] bought and sold billions of newly-issued shares of microcap securities (*i.e.*, penny stocks)—and generated millions of dollars from those sales—but failed to comply with the mandatory dealer registration requirements of federal securities laws.

4.      Indeed, from just June 2015 through September 2021, Defendants converted and sold over 5.2 billion shares of stock, generating tens of millions of dollars in gross stock sale proceeds, with many other securities transactions through convertible notes and other market adjustable securities still outstanding.

---

[2]    Based on a review of filings in the EDGAR database from June 16, 2015 to date Power Up has engaged in financing similar to this case on at least **934** separate occasions with at least **148** other microcap companies, resulting in approximately  **934** securities transactions with at least  **5,284,688,117** shares worth tens of millions of dollars.

[3]    *See, e.g., SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020); *SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020).

[4]    The stock is generally obtained via one or more market-adjustable convertible debt products required by the lender for making the loan; this may be the convertible promissory note itself or a warrant.

[5]    Power Up is the primary defendant in this action, but several other commonly owned and controlled entities associated with Power Up include, KBM Worldwide, Inc., Vis Vires Group, Inc., Redstart Holdings Corp., Geneva Roth Remark Holdings, Inc., Mazuma Holding Corp., Asher Enterprises, Inc., and Hope Capital, Inc. (collectively referred to as "Related Entities").

5.      By engaging in a regular business of buying convertible notes (securities) for their own account and then selling the resulting newly-issued discounted shares of penny stock companies' (securities) into the public market, Defendants operated as unregistered securities dealers.

6.      The Agreements[6] in this case are a masterful example of toxic lending. In this case, Power Up received approximately $607,996.31 ($318,996.31 in excess of the principal of the Notes) in exchange for seven loans with an aggregate principal value of $289,000.  On a percentage basis, Power Up's combined return was an unfathomable 210% gain.

7.      The Agreements are patently unlawful, as they were made and subsequently performed in violation of Section 15(a) of the Securities Exchange Act of 1934 (the "Act"). Plaintiff seeks rescission of the Agreements, rescissionary damages equal to the gross proceeds Defendants received from the sale of Plaintiff's stock, less the amounts advanced by Defendants

---

[6]    "Agreements" are defined as the documents executed by Plaintiff in favor of Power Up. Specifically: (1) on July 9, 2018, VNUE and Power Up entered into a Convertible Promissory Note ("July 18 Note"), under which Power Up purchased from VNUE a note in the amount of $63,000.00 bearing a 12% annual interest rate, and a Securities Purchase Agreement ("July 18 SPA"); (2) on August 30, 2018, VNUE and Power Up entered into a Convertible Promissory Note ("August 18 Note"), under which Power Up purchased from VNUE a note in the amount of $35,000.00 bearing a 12% annual interest rate, and a Securities Purchase Agreement ("August 18 SPA"); (3) on October 18, 2018, VNUE and Power Up entered into a Convertible Promissory Note ("October 18 Note"), under which Power Up purchased from VNUE a note in the amount of $35,000.00 bearing a 12% annual interest rate, and a Securities Purchase Agreement ("October 18 SPA"); (4) on January 17, 2019, VNUE and Power Up entered into a Convertible Promissory Note ("January 19 Note"), under which Power Up purchased from VNUE a note in the amount of $35,000.00 bearing a 12% annual interest rate, and a Securities Purchase Agreement ("January 19 SPA"); (5) On March 25, 2019 VNUE and Power Up entered into a Convertible Promissory Note ("March 19 Note"), under which Power Up purchased from VNUE a note in the amount of $38,000.00 bearing a 12% annual interest rate, and a SPA ("March 19 SPA"); (6)  On July 3, 2019, VNUE and Power Up entered into a Convertible Promissory Note ("July 19 Note"), under which Power Up purchased from VNUE a note in the amount of $53,000.00 bearing a 12% annual interest rate, and a SPA ("July 19 SPA"); (7) on August 2, 2019, VNUE and Power Up entered into a Convertible Promissory Note ("August 19 Note", and together with the July 18 Note, October 18 Note, March 19 Note, and July 19 Note, the "Notes"), under which Power Up purchased from VNUE a note in the amount of $30,000.00 bearing a 12% annual interest rate, and a SPA ("August 19 SPA", and together with the July 18 SPA, October 18 SPA, March 19 SPA, and July 19 SPA, the "SPAs"). A true and correct copy of each of the Notes and SPAs are attached hereto as follows: July 18 Note & July 18 SPA as **Exhibit 1**; August 18 Note and August 18 SPA as **Exhibit 2**; October 18 Note and October 18 SPA as **Exhibit 3**;  January 19 Note  and January 19 SPA as **Exhibit 4**; March 19 Note and March 19 SPA as **Exhibit 5**; July 19 Note and July 19 SPA as **Exhibit 6**; & August 19 Note and August 19 SPA as **Exhibit 7**.

The transaction resulting from the execution of the Agreements is hereinafter referred to as the "VNUE Transaction."

to Plaintiff, attorneys' fees, and any and all other relief that the Court deems just, proper, and in the interest of justice.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Act.

9.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in this District as Kramer and Power Up operated their business out of this District.

## PARTIES

11.      VNUE is a Nevada corporation with its principal place of business at 104 W. 29th Street, 11th Floor, New York, New York 10001.

12.      VNUE stock trades on the over-the-counter ("OTC") market, where the stocks of early-stage, developing companies—too small for the major exchanges—are traded.

13.      Power Up is a Virginia corporation that maintains its principal place of business at 111 Great Neck Road, Suite 214, Great Neck, NY 11021.

14.      Kramer, upon information and belief, is a resident of the State of New York. Kramer is the Chief Executive Officer of Defendant Power Up, and the signatory on the Agreements in this case.

15.      Kramer was registered as a broker with the Financial Industry Regulatory Authority, Inc. ("FINRA") between January 1998 and July 2002.  His license as a broker was terminated in July 2002.

16.     Relevant databases confirm that neither "Power Up Lending Group Ltd.", nor Kramer were registered as a securities dealer with the SEC (or Self-Regulatory Organization, such as FINRA) at all relevant times herein.

## FACTUAL ALLEGATIONS

17.     During the relevant period, Defendants, and their Related Entities, operated a regular business through which they bought convertible notes—a type of debt security convertible into securities—for Defendants' own account from penny stock issuers in need of cash.  After typically holding the notes for a period of time contained in an SEC safe harbor (SEC Rule 144) that, if satisfied, deems one not to fall within the statutory definition of an underwriter—six months for issuers that are required to file periodic and other certain reports with the SEC, one year for issuers that are not required to do so—Defendants convert the notes into newly-issued shares of stock held by Power Up at a deep discount to the prevailing market price according to their securities transaction documents.  After conversion, Defendants promptly sell that stock into the market, locking in substantial profits.

18.     The extent of the illegal business model that violates federal securities laws deployed by Power Up and Kramer is breathtakingly complex, running through several different Related Entities over the course of at least the last 10 years.

I.     **THE DEFENDANTS' GENERAL BUSINESS MODEL**

*Defendants Solicited Financially-Strapped Issuers*
*in Need of Capital*

19.     Defendants advertise this slogan on their website's landing page: "Business Loans, Fast and Easy." Defendants' criteria for a business owner seeking funding, "fast and easy," is

unsurprisingly low, only requiring a business to operate for at least 6 months, a personal credit score over 500, and a trending annual revenue of $100,000.  *See* poweruplending.com.[7]

20.     Defendants also directly solicited penny stock issuers by cold calling them or meeting with issuer representatives at Defendant sponsored and unsponsored conferences that include microcap conferences and investment banking conferences.   In these direct issuer solicitations, Defendants typically represented to issuers that Defendants sought to invest in the issuer's stock and explained the benefits of a convertible debt transaction.

21.     Because the counterparty issuers in Defendants' convertible note shakedowns often had minimal assets, negative cash flows from operations, and/or unstable operating histories, these companies usually were unable to obtain financing from banks.  Therefore, Defendants carefully positioned themselves to take advantage of these issuer's poor financial conditions and were able to negotiate highly favorable terms governing the deals with the financially-trapped issuers.

22.     In soliciting issuers for potential convertible note securities transactions, Defendants generally targeted penny stock issuers that had historically large trading volumes—or the potential for large trading volumes—and that were current in their reporting, so that Defendants could easily convert and quickly sell the shares after the required six month holding period. Defendants also looked at the amount of other outstanding convertible debt financing, and the amount of authorized but unissued shares.

23.     Defendants targeted these types of issuers with the goal of easily converting and selling into the public market the issuers' shares acquired through the securities transactions.

---

[7]     This language usually applies to Defendants' merchant cash advance ("MCA") lending business with small businesses (public and private) that utilizes ACH daily or weekly payments (not stock) to effectuate repayment.  The New York Attorney general has commenced several actions against similar MCA lenders whose transactions have been found to be loans that impose interest rates in violation of New York's usury laws.  *People v. Richmond Capital Group LLC*, Index No. 451368/2020 (N.Y. Sup. Ct. June 2, 2021).

24.     Defendants sought to engage in convertible notes deals with penny stock issuers in trending industries so that there would be sufficient interest by the investing public to buy the shares that Defendants acquired through the deals.

*Defendants Purchased Convertible Promissory*
*Notes With Favorable Terms In Order to Obtain*
*Shares of Stock*

25.     Defendants obtained all of the stock they sold as part of their business directly from the issuers through note conversions, as opposed to purchases in the open public trading or secondary markets.  The billions of shares that Defendants obtained through their deals with issuers were newly-issued, and their later sales of the shares in the market significantly increased both the amount of shares in the hands of the public and the issuers' outstanding share totals.  Selling into the public market large quantities of newly-issued shares obtained directly from issuers is a common hallmark of a securities dealer.

26.     In addition to profiting from stock sales, in many instances, the Defendants negotiated with the counterparty issuers, often reserving an Original Issue Discount or "OID," which entitled Power Up to repayment or the conversion of stock worth more than the purchase price of the note, at no cost to Power Up.

27.     Further, the Defendants usually charged counterparty issuers "transactional" or "due diligence" fees for entering into the notes, generally ranging from $3,000.00 to $5,000.00 for most deals.  Defendants typically directed that the transactional fees be included as part of the purchase price of the note and paid to Power Up.

*Defendants Converted Promissory Note Debt Into*
*Stock at a Substantial Discount*

28.     SEC Rule 144, a safe harbor from the statutory definition of an underwriter, was adopted to establish criteria for determining whether a person was engaged in the distribution of

securities.  Under Rule 144, non-affiliates who acquire restricted stock directly or indirectly from the issuer in a private transaction may be able to resell it free of restriction into the market after observing a holding period.  *See* 17 C.F.R. § 210.144.

29.     Defendants timed their conversions and sales in an effort to comply with the holding period under Rule 144.  For that reason, Defendants generally waited either six months (the minimum Rule 144 holding period for securities issued by SEC-reporting companies) or one year (the minimum Rule 144 holding period for securities issued by non-SEC-reporting companies) after purchasing a convertible note before they began to convert the note to newly-issued stock and then sell that stock into the public market.

30.     The convertible notes that Defendants bought from the issuers allowed Defendants to acquire billions of shares of issuer stock at a substantial discount—typically between 38 to 45 percent below the average of the lowest two (2) trading prices for issuer's common stock during the fifteen (15) days preceding the date of the conversion request.

31.     Certain convertible note deals imposed additional default penalties on issuers if Defendants encountered difficulty depositing the stock with brokerages, or if the issuer defaulted on the note.  Many of the notes also had rather draconian prepayment provisions that discouraged the issuer from paying off the notes ahead of schedule, which allowed Defendants time to convert the maximum amount of debt into stock.

32.     After holding the convertible debt acquired in a convertible note deal for the applicable holding period contained in Rule 144, Defendants sent conversion notices to the issuers and their transfer agents identifying the amount to be converted and the corresponding shares to be received by Defendants.

33.     Instead of converting all of the debt into stock all at once, Defendants usually sent multiple conversion notices for each convertible note.  Among other reasons, Defendants convert debt over a period of time to avoid owning more than five percent of any class of an issuer's publicly traded stock, which would have required Defendants to file a "beneficial ownership report" (SEC Schedule 13D) with the SEC.

34.     Defendants arranged for the converted stock to be transferred to Power Up's brokerage accounts as quickly as possible, including often paying rush fees to expedite the process. As part of this process, Defendants obtained rather elusive and often times inaccurate attorney opinion letters to assure brokerage firms that the converted stock was not restricted and could be resold to the public.

*Defendants Sold the Converted Stock Into the
Public Market*

35.     Once brokers deposit the converted shares from the issuers into the Power Up's brokerage accounts, Defendants usually begin selling the shares into the public market immediately to lock in their profits.

36.     Kramer personally, or through an affiliated person, entity or independent contractor acting at his direction, used the telephone and the Internet to place sell orders.  Sales were made through brokers.

37.     However, Defendants generally only sold as much as the market would bear, often staggering their sales over a period of time instead of all at once.

38.     Defendants' practice was to sell the shares they had acquired in a conversion continuously on a daily or near-daily basis until they had sold all of their shares into the market.

*Defendants Earn Significant Profits from Selling*
*Discounted Shares of Stock*

39.     Defendants reaped large profits from their unregistered dealer activity, the majority of which resulted from the difference between the market prices they received when they sold the stock to the public, and the deeply discounted prices at which they acquired shares from the issuers, rather than from any appreciation in the stock's price.  This mechanism, which gave Defendants a spread or markup on the stock that they sold, is a common attribute of a securities dealer.

40.     From June 2015 through September 2021, Defendants purchased more than **612 convertible promissory notes** from approximately **148 different penny stock issuers** and **sold more than 5.2 billion newly-issued shares of stock** obtained from those notes into the public market for Defendants' own account.

41.     During this same timeframe, Defendants generated tens of millions of dollars in gross stock sale proceeds, with many other securities transactions still outstanding.  The majority of the net profits came from the spread between Defendants' discounted acquisition cost for the stock and the prevailing market price.

42.     The following are examples of transactions during the relevant period in which Defendants acquired convertible notes from specific penny stock issuers, exercised their conversion rights, and, upon information and belief, sold the resulting newly-issued stock into the market for a significant profit:

     a.     Defendants acquired convertible notes from Grow Solutions Holdings, Inc., a company involved in the cannabis industry, in which they invested more than $125,000.00, received **more than 41,747,801 shares** worth approximately **$495,937.82** which were likely sold into the market shortly thereafter;

     b.   Defendants acquired convertible notes from Phi Group, Inc., a company involved in consulting and advising, in which they invested more than $462,500.00, received **more than 2,282,230,845 shares** worth approximately **$969,317.66** which were likely sold into the market shortly thereafter; and

     c.   Defendants acquired convertible notes from Probility Media Corp., a company involved in media and entertainment, in which they invested more than $158,000.00, received **more than 784,683,333 shares** worth approximately **$241,236.67** which were likely sold into the market shortly thereafter.

43.    In addition to the preceding securities transactions, Defendants have engaged in no less than **931** additional securities transactions with no less than **145** additional issuers since June 2015.

44.    Upon information and belief, Defendants used the proceeds from the sales of the shares to fund their regular business of purchasing additional convertible promissory notes.

*Defendants Continue to Convert and Sell Shares of Stock*

45.    Defendants continue to purchase new convertible notes, convert shares acquired in convertible debt transactions with counterparty penny stock issuers, and then sell those shares into the market.  In just the first eight months of 2021 (through September 2021), Defendants have purchased no less than **48** convertible notes from no less than **7** issuers pursuant to which they converted and sold **372,867,042** shares of stock.

46.    Defendants sold stock that did not meet any of the exceptions from the definition of a "penny stock," as defined by Section 3(a)(51) of the Act and Rule 3a51-1 under the Act.  *See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51–1.

## II.   DEFENDANTS' BUSINESS MODEL AS APPLIED TO PLAINTIFF

*Defendants Purchased Convertible Notes*
*(Securities) from Plaintiff*

47.   The Power Up business model—as reflected in the conduct alleged above—manifests numerous and substantial characteristics of dealer activity, consistent with ongoing SEC prosecutions and other Federal court decisions, including several U.S. Circuit Court of Appeals decisions.

48.   Chief among these characteristics is reaping profits from the purchasing of convertible notes and selling newly-issued securities that would be acquired directly from an issuer through conversion for Defendants' own account.

49.   The transactions between Power Up and VNUE in this case are all purchases of convertible promissory notes which are securities transactions, as made, and are, therefore, unlawful.

50.   Defendants purchased seven (7) convertible promissory notes from VNUE over the span of approximately one year: (1) the July 18 Note; (2) the August 18 Note; (3) the October 18 Note; (4) the January 19 Note; (5) the March 19 Note; (6) the July 19 Note; and (7) the August 19 Note.

51.   As defined under the Act,[8] each of the following is a transaction in securities:

   a.   the purchase of the July 18 Note;

   b.   the purchase of the August 18 Note;

   c.   the purchase of the October 18 Note;

   d.   the purchase of the January 19 Note;

   e.   the purchase of the March 19 Note;

---

[8]   "The term "security" means any **note**, stock, treasury stock…"  *See* 15 U.S.C. § 78c.

     f.     the purchase of the July 19 Note; and

     g.     the purchase of the August 19 Note.

52.     Each convertible note entered into by Defendants identified in Paragraph 51 above is a securities transaction.

*Defendants Converted the Notes (Securities) to*
*Stock (Securities) Pursuant to the Notes with*
*Plaintiff*

53.     Starting on January 10, 2019—almost the exact date of the expiration of the Rule 144 holding period for the first note (July 18 Note) on July 9, 2018—Power Up submitted **33** separate conversions under the Notes, pursuant to which Power Up received **619,117,935** newly issued VNUE securities (hereinafter, the "Related Transactions").

54.     Each of the 33 conversions is a separate securities transaction.

55.     Pursuant to those 33 conversions, Power Up converted a total of $266,960.00 of debt.  The open market value of the 619,117,935 newly-issued VNUE securities received by Power Up pursuant to the conversions is approximately **$569,196.31**.

56.     As mentioned above, Defendants timed their conversions and sales in an effort to comply with the holding period under Rule 144 and thereby began converting almost immediately after the expiration of the holding period as follows:[9]

     a.     The July 18 Note:

          i.     on January 10, 2019, a conversion notice was submitted requesting issuance of 4,210,526 shares for the satisfaction of $8,000.00 of debt;

---

[9]    The August 19 Note was paid back fully in cash, and therefore, there are no notices of conversion on the August 19 Note.

      ii.     on January 15, 2019, a conversion notice was submitted requesting issuance of 5,263,158 shares for the satisfaction of $10,000.00 of debt;

      iii.    on January 18, 2019, a conversion notice was submitted requesting issuance of 5,268,421 shares for the satisfaction of $10,010.00 of debt;

      iv.    on January 23, 2019, a conversion notice was submitted requesting issuance of 5,267,500 shares for the satisfaction of $10,535.00 of debt;

      v.     on January 28, 2019, a conversion notice was submitted requesting issuance of 5,050,505 shares for the satisfaction of $10,000.00 of debt; and

      vi.    on January 29, 2019, a conversion notice was submitted requesting issuance of 3,941,919 shares for the satisfaction of $4,025.00 of debt.

b.    The August 18 Note:

      i.     on March 4, 2019, a conversion notice was submitted requesting issuance of 8,193,750 shares for the satisfaction of $13,110.00 of debt;

      ii.     on March 8, 2019, a conversion notice was submitted requesting issuance of 7,431,250 shares for the satisfaction of $11,890.00 of debt; and

          iii.     on March 11, 2019, a conversion notice was submitted requesting issuance of 7,562,500 shares for the satisfaction of $10,000.00 of debt.

c.    The October 18 Note:

          i.     on April 24, 2019, a conversion notice was submitted requesting issuance of 12,706,897 shares for the satisfaction of $11,055.00 of debt;

          ii.     on May 1, 2019, a conversion notice was submitted requesting issuance of 11,000,000 shares for the satisfaction of $9,900.00 of debt;

          iii.     on May 1, 2019, a conversion notice was submitted requesting issuance of 12,700 shares for the satisfaction of $12,700.00 of debt; and

          iv.     on May 2, 2019, a conversion notice was submitted requesting issuance of 3,445,000 shares for the satisfaction of $1,345.00 of debt.

d.    The January 19 Note:

          i.     on July 22, 2019, a conversion notice was submitted requesting issuance of 18,478,261 shares for the satisfaction of $8,500.00 of debt;

          ii.     on July 25, 2019, a conversion notice was submitted requesting issuance of 18,571,429 shares for the satisfaction of $6,500.00 of debt;

  iii.  on July 25, 2019, a conversion notice was submitted requesting issuance of 18,571,429 shares for the satisfaction of $6,500.00 of debt;

  iv.  on July 29, 2019, a conversion notice was submitted requesting issuance of 24,285,714 shares for the satisfaction of $7,100.00 of debt;

  v.  on July 29, 2019, a conversion notice was submitted requesting issuance of 18,285,714 shares for the satisfaction of $6,400.00 of debt; and

  vi.  on July 30, 2019, a conversion notice was submitted requesting issuance of 2,000,000 shares for the satisfaction of $700.00 of debt.

e.  The March 19 Note:

  i.  on September 30, 2019, a conversion notice was submitted requesting issuance of 28,285,714 shares for the satisfaction of $9,900.00 of debt;

  ii.  on October 1, 2019, a conversion notice was submitted requesting issuance of 28,275,862 shares for the satisfaction of $8,200.00 of debt;

  iii.  on October 1, 2019, a conversion notice was submitted requesting issuance of 28,275,862 shares for the satisfaction of $8,200.00 of debt;

       iv.     on October 2, 2019, a conversion notice was submitted requesting issuance of 28,275,862 shares for the satisfaction of $8,200.00 of debt; and

       v.     on October 4, 2019, a conversion notice was submitted requesting issuance of 25,130,435 shares for the satisfaction of $3,500.00 of debt.

f.     The July 19 Note:

       i.     on January 9, 2020, a conversion notice was submitted requesting issuance of 38,235,294 shares for the satisfaction of $6,500.00 of debt;

       ii.     on January 30, 2020, a conversion notice was submitted requesting issuance of 38,235,294 shares for the satisfaction of 6,500.00 of debt;

       iii.     on January 31, 2020, a conversion notice was submitted requesting issuance of 38,235,294 shares for the satisfaction of $6,500.00 of debt;

       iv.     on February 4, 2020, a conversion notice was submitted requesting issuance of 44,166,667 shares for the satisfaction of $5,300.00 of debt;

       v.     on February 5, 2020, a conversion notice was submitted requesting issuance of 44,166,667 shares for the satisfaction of $5,300.00 of debt;

vi.     on February 6, 2020, a conversion notice was submitted requesting issuance of 44,166,667 shares for the satisfaction of $5,300.00 of debt;

vii.    on February 10, 2020, a conversion notice was submitted requesting issuance of 44,166,667 shares for the satisfaction of $5,300.00 of debt;

viii.   on February 12, 2020, a conversion notice was submitted requesting issuance of 44,166,667 shares for the satisfaction of $5,300.00 of debt; and

ix.     on February 18, 2020, a conversion notice was submitted requesting issuance of 43,333,333 shares for the satisfaction of $2,600.00 of debt.

57.    Each conversion of debt to stock identified in Paragraph 56 above constitutes additional securities transactions.

*Defendants Quickly Sold Plaintiff's Stock*
*(Securities) it Would Acquire through Conversion*

58.    Investment is not part of Power Up's business model.

59.    Power Up relied on its conversion discount to maximize profits while it drove down VNUE's trading price due to the liquidation of its sizable positions.

60.    Power Up's business model is similar to the one used by the defendants in *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2016), *SEC v. Almagarby*, 479 F.Supp.3d 1266 (S.D. Fla. 2020), and *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020).

61.     Upon information and belief, as soon as Power Up received the newly-issued VNUE shares, it immediately sold them into the marketplace to reap a substantial profit—even while VNUE's trading price was falling.

62.     Defendants therefore participated in the offering of Plaintiff's penny stock by acting as securities dealers engaged in the selling of penny stocks.

63.     Defendants are one of the larger and more active sellers in the market for many issuers' stock.  For example, during 2019 shortly after executing the July 18 Note (the first of seven), Defendants actively converted stock of the Plaintiff.  As the table below shows, Plaintiff's approximate average daily volume significantly increased for the days following the date of a conversion notice relative to days prior to the issuer's toxic death spiral (*i.e.*, before mass conversions began flooding the market with newly-issued shares), which inevitably occurred due to the massive selling of the shares Defendants acquired through conversion:

| VNUE's Trading Volume Analysis[10] | | | | |
|---|---|---|---|---|
| Average Volume for 30-Day Period Preceding 01/10/2019 Conversion Notice under First Note | Average Volume 10-Day Period Succeeding the 01/10/2019 Notice of Conversion | Average Volume 10-Day Period Succeeding the 01/15/2019 Notice of Conversion | Average Volume 10-Day Period Succeeding the 01/18/2019 Notice of Conversion | Average Volume 10-Day Period Succeeding the 01/23/2019 Notice of Conversion |
| 567,993 | 6,806,470 | 10,565,000 | 12,184,000 | 11,876,000 |

---

[10]   This analysis was conducted based only on the July 18 Note (the first note between the parties) and the conversions thereunder because it provides the most organic display of market activity absent the entry of newly-issued shares being rapidly dumped into the market due to the voluminous and successive conversions that occurred, and continued to occur, for years following entry into the July 18 Note.

*Defendants Violated The Federal Securities Laws*
*by Acting as Unregistered Dealers*

64.     Power Up's purchases of convertible notes (securities transaction), conversions of debt into stock (securities transaction), and subsequent stock sales (securities transaction) are part of an ongoing business.  Power Up acquires large volumes of shares privately from issuers at a substantial discount to market, sells large volumes of shares back into the open market for substantial profit due to the conversion discount, and always does so absent investment intent. Power Up does all of this, buys, converts, and sells securities, as part of its regular business for its own account.

65.     The SEC's EDGAR database shows that since 2015, Power Up has purchased similar convertible securities on more than 612 occasions, from at least 148 other microcap companies.

66.     Upon information and belief, Power Up made use of the mails, email, and other instrumentalities of interstate commerce to effect the securities transactions under the Agreements. For example, Defendants used the internet to solicit penny stock issuers, transferred cash through wire transfers, and used email and telephone communications to negotiate and effectuate sales transactions through their brokers.

67.     Defendants paid several independent contractors to assist them in locating, negotiating, and managing Power Up's transactions.

68.     By failing to comply with the dealer registration requirements and federal securities laws, Power Up purposefully "operated under the radar" to avoid important regulatory obligations that govern dealer conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.

69.     In light of the difficulty of assessing damages, the equitable remedy of rescission indicated by § 29(b) of the Act, voiding and rescinding the Agreements (to return the parties to their pre-contract position) should be effectuated by mandating Power Up to return to VNUE every share of stock it acquired under the Notes (or the cash equivalent thereof) with an aggregate value of **$607,996.31**, less the net sum provided to the Plaintiff for the purchase of the Notes.

70.     VNUE is further entitled to statutory prejudgment interest on the value of the stock and the cash payments.

71.     In the alternative, Power Up should pay rescissionary damages in an amount constituting the full market value of the stock wrongfully acquired and cash amounts received, both with statutory prejudgment interest.

72.     Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC or, in the case of a natural person, associate with a registered dealer.  *See* 15 U.S.C. § 78o(a)(1).

73.     Defendants engaged in much (if not all) of the conduct described in this Complaint at their Great Neck, New York address in this District.

74.     While Defendants engaged in this conduct, they were not registered with the SEC as dealers or associated with dealers registered with the SEC.

75.     A person who acts as a dealer must file an application on a form called Form BD. Form BD asks questions about the applicant and its principals, controlling persons, and employees. An applicant must file the Form BD with the Central Registration Depository, which is operated by FINRA.  The dealer registration requirements provide important safeguards for the investing public.

76.     For example, registration with the SEC requires the dealer to disclose important information about its business, including but not limited to: (a) the names of the direct and indirect owners and executive officers of the business; (b) certain arrangements with other persons or entities; (c) the identities of those who control the business; (d) the states in which the dealer does business; (e) past criminal or regulatory actions against the dealer or any affiliated person that controls the business; and (f) financial information, including bankruptcy history.  Further, registration requires the dealer to join a self- regulatory organization, such as FINRA, or a national security exchange, which assists the SEC in regulating the activities of registered dealers.  Finally, registered dealers are subject to inspection by the SEC and FINRA to ensure that they comply with the securities laws.

*Kramer Controlled Power Up, as well as its Related*
*Entities, in Convertible Debt Businesses*

77.     At all relevant times, Kramer possessed and exercised the ultimate decision-making and control over Power Up, including the power to decide whether to enter into each of the securities transactions (including the Notes with Plaintiff), to negotiate and approve the final deal terms, and to monitor the status of Power Up's investments and its sales of stock.

78.     Kramer, as the Manager of Power Up, had sole and exclusive control and final decision-making authority over Power Up.

79.     Kramer personally negotiated the terms of the convertible notes that Power Up purchased from penny stock issuers (including the Notes with Plaintiff), as well as amendments to the original terms.  Kramer also signed the contracts by which Power Up acquired the convertible notes, including all Notes with Plaintiff.

80. In addition to Power Up, Kramer has been involved with numerous Related Entities in an authoritative capacity, all of which engage in eerily similar, although not exactly the same, unlawful securities transactions as Power Up.[11]

81. Kramer, based on his previous experience as a registered broker, knew Power Up was required to register as a dealer due to its dealer activity and intentionally decided not to direct Power Up to register as a Dealer.

82. Ultimately, Kramer was and remains the sole person with the power to direct, authorize, and compel Power Up to enter into, convert, and subsequently sell securities through convertible notes with issuers, including the Notes with VNUE.

### **FIRST CLAIM FOR RELIEF:**

*Violation of Section 15(a) the Act by Power Up for*
*Making the Agreements Absent Dealer Registration*

83. Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

84. Section 29(b) of the Exchange Act provides in relevant part that:

> **Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder … shall be void** (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or … engaged in the performance of any such contract**…**

15 U.S.C. § 78cc(b) (emphasis added).

---

[11] On November 25, 2017, the SEC charged Kramer and Mazuma Holding Corp. with violating the federal securities laws they obtained unregistered shares in penny-stock issuers Laidlaw Energy Group and Bederra Corp. Kramer and Mazuma Holding Corp. purchased over $1 million in unregistered shares in Laidlaw, which ultimately exceeded the Rule 504 limit, and acquired and sold over $1 billion unregistered shares in Bederra at a significant discount from prevailing market prices. On October 27, 2016, the SEC ordered a cease-and-desist proceeding against Curt Kramer and Hope Capital, Inc. for violations of the Securities Act of 1933. From December 2008 to May 2009, Kramer and Hope Capital, Inc. sold over 113.5 million shares of Spongetech Delivery Systems, Inc. stock, and sold the shares in U.S. public markets within days or a few weeks of the purchase at significant discounts from the market prices.

85.     The Agreements were made in violation of Section 15(a) of the Act [15 U.S.C. § 78o(a)(1)], which prohibits unregistered dealers from using any means of interstate commerce to effect transactions in securities.

86.     Power Up is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

87.     Power Up is not registered as a dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act [15 U.S.C. § 78o(a)(1)].

88.     Power Up effected transactions in securities in the VNUE Transaction and in the Related Transactions.

89.     Power Up used the means of interstate commerce to effectuate the VNUE Transaction and in the Related Transactions.

90.     As a party to the Agreements and the Related Transactions, VNUE is in contractual privity with Power Up.

91.     The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, VNUE, as an issuer, is within the class of persons that the Act was designed to protect.

92.     Because Power Up effected the VNUE Transaction and in the Related Transactions in securities as an unregistered dealer, and utilized the means of interstate commerce in connection therewith, the Agreements were unlawful when made.

## SECOND CLAIM FOR RELIEF:

*Violation of Section 15(a) the Act by Power Up for*
*Performing the Agreements Absent Dealer*
*Registration*

93.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

94.     Section 29(b) of the Exchange Act provides in relevant part that:

> **Every contract …** (including any contract for listing a security on an exchange) heretofore or hereafter made, **the performance of which involves the violation of**, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, **shall be void** (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or  … engaged in the performance of any such contract**… Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore** or hereafter made, **… shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made… any such contract…**

15 U.S.C. § 78cc(b) (emphasis added).

95.     The Agreements were performed in violation of Section 15(a) of the Act [15 U.S.C. § 78o(a)(1)], which prohibits unregistered dealers from using any means of interstate commerce to effect transactions in securities.

96.     Power Up is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

97.     Power Up is not registered as a dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act [15 U.S.C. § 78o(a)(1)].

98.     Power Up effected transactions in securities in the VNUE Transaction and in the Related Transactions.

99.     Power Up used the means of interstate commerce to effectuate the VNUE Transaction and in the Related Transactions.

100.     As a party to the Agreements and the Related Transactions, VNUE is in contractual privity with Power Up.

101.     The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, VNUE, as an issuer, is within the class of persons that the Act was designed to protect.

102.     Because Power Up effected the VNUE Transaction and in the Related Transactions in securities as an unregistered dealer, and utilized the means of interstate commerce in connection therewith, the Agreements were unlawful when performed (via the conversions).

### THIRD CLAIM FOR RELIEF:

*Violation of Section 20(a) the Act by Kramer as a*
*Control Person of Power Up Based on Power Up's*
*Transactions in Securities as an Unregistered*
*Dealer*

103.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior paragraphs as though set forth herein.

104.     Kramer had the power and authority to cause Power Up to engage in the wrongful conduct described in Counts I and II herein.

105.     Kramer did in fact cause Power Up to engage in the wrongful conduct described herein in paragraphs 1 through 102 (including Counts I and II).

106.     Kramer did not act in good faith.

107.     Kramer directly and/or indirectly induced the acts and conduct that constitute the violations in this case.

108.     Therefore, Kramer acted as a control person of Power Up within the meaning of § 20(a) of the Act [15 U.S.C. § 78t].

## FOURTH CLAIM FOR RELIEF:

*Unjust Enrichment*

*(Against All Defendants)*

109.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

110.    The Defendants have received valuable benefits from VNUE, including, *inter alia*, the stock and profits realized from the sale of the unlawfully issued shares of VNUE common stock.

111.    These benefits are the result of the wrongful conduct alleged herein in Counts I-III.

112.    The Defendants have unjustly retained these benefits at VNUE's and its stockholders' expense.

113.    As a result, the Defendants have been unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff VNUE seeks a Verdict and Judgment against the Defendants herein as follows:

A.    Count I (Against Power Up)

    a.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

        i.    the Agreements and Related Transactions are transactions in securities within the meaning set forth in the Act [15 U.S.C. § 78c(a)];

        ii.    Power Up is operating as an unregistered dealer in securities, in violation of the Act [15 U.S.C. § 78o];

        iii.    the Agreements are void and subject to rescission under the Act [15

U.S.C. § 78cc]; and

iv.     Power Up is entitled to retain the principal amount of the loans made pursuant to Agreements, already repaid by VNUE.

b.     Power Up requests that the Court enter an Order:

i.     rescinding the Agreements pursuant to the Act [15 U.S.C. § 78cc];

ii.     awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

iii.     requiring Power Up to return to VNUE all VNUE stock obtained via the Agreements;

iv.     awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

B.     Count II (Against Power Up)

a.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

i.     the Agreements and Related Transactions are transactions in securities within the meaning set forth in the Act [15 U.S.C. § 78c(a)];

ii.     Power Up is operating as an unregistered dealer in securities, in violation of the Act [15 U.S.C. § 78o];

iii.     the Agreements are void and subject to rescission under the Act [15 U.S.C. § 78cc]; and

iv.     Power Up is entitled to retain the principal amount of the loans made

pursuant to Agreements, already repaid by VNUE.

b. Power Up requests that the Court enter an Order:

   i. rescinding the Agreements pursuant to the Act [15 U.S.C. § 78cc];

   ii. awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

   iii. requiring Power Up to return to VNUE all VNUE stock obtained via the Agreements;

   iv. awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

C. Count III (Against Kramer)

a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

   i. Kramer had the power and authority to cause Power Up to engage in the wrongful conduct described in Counts I and II herein;

   ii. Kramer did in fact cause Power Up to engage in the wrongful conduct described in Counts I and II herein; and

   iii. Kramer acted as a control person of Power Up within the meaning of Section 20(a) of the Act [15 U.S.C. § 78t(a)].

b. VNUE requests that the court enter an Order, pursuant to Section 20(a) of the Act [15 U.S.C. § 78t(a)], holding Kramer jointly and severally liable with and to the same extent as Power Up is liable to VNUE under Counts I, II, and/or IV herein.

D.     Count IV (Against all Defendants)

    a.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

        i.     Defendants have voluntarily accepted and retained the property conferred by Power Up on the Defendants through and as a result of violations of the Act [15 U.S.C. § 78o]; and

        ii.     the circumstances are such that it would be inequitable for the Defendants to retain the property conferred on them by VNUE without first paying the value thereof to VNUE, to prevent the Defendants from being unjustly enriched.

    b.     VNUE requests that the Court enter an Order requiring the Defendants to return to VNUE the value of the property they have unjustly retained in the amount of $607,996.31 less the value conferred upon the Plaintiff.

E.     As to each of the foregoing Counts I-IV, to the extent permitted by applicable law, and not otherwise requested, VNUE requests that the Court enter an Order:

    a.     awarding VNUE compensatory, direct, and consequential damages;

    b.     awarding VNUE punitive and/or treble damages, to deter the Defendants from continuing to engage in the same wrongful and unlawful transactions;

    c.     awarding VNUE its attorneys' fees and costs associated with this litigation;

    d.     entering an award of monetary damages jointly and severally against the Defendants;

    e.     awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues properly so tried.

DATED:   October 6, 2021

Respectfully Submitted,

*/s/ Gustave P. Passanante*
Gustave P. Passanante, Esq.
Catherine Gretschel, Esq.
**THE BASILE LAW FIRM P.C.**
390 North Broadway, Suite 140
Jericho, NY 11753
Tel.:   (516) 455-1500
Fax:   (631) 498-0748
Email: gus@thebasilelawfirm.com
          cat@thebasilelawfirm.com

***Attorneys for Plaintiff VNUE, Inc.***