# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Helgi C. Walker
Direct: +1 202.887.3599
Fax: +1 202.530.9595
HWalker@gibsondunn.com

December 10, 2021

<u>VIA ECF</u>

The Honorable Diane Gujarati
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    *Vnue, Inc. v. Power Up Lending Group, Ltd. et al.*, No. 2:21-cv-5545

Dear Judge Gujarati:

Under Rule III(A) of this Court's Individual Rules, Defendants Power Up Lending Group, Ltd. and Curt Kramer (collectively, "Power Up Lending") respectfully request a pre-motion conference on their anticipated motion to dismiss.

This case is one of a number of similar lawsuits filed by plaintiff's counsel seeking to "rescind" fully completed convertible loan agreements in the hopes of obtaining windfall profits. In this case, in seven separate transactions, spread over thirteen months, Plaintiff Vnue, Inc. borrowed a total of $289,000 from Power Up Lending, which Vnue had the option to repay in cash or its stock. *See* Compl. at 3 n.6. Vnue's CEO personally signed every contract, initialing each page in the process. *See, e.g.*, Compl. Ex. 1 (Dkt. 1-4). And Vnue's board of directors—on seven separate occasions—attested that it had reviewed the loan agreements and concluded that each transaction was "in the best interests of the Corporation." (Vnue selectively omitted these attestations from the transaction documents it attached to the complaint, but the full agreements are properly subject to judicial notice. *See, e.g.*, *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).)

Now, more than two years after the seventh and final loan agreement was executed, *see* Compl. at 3 n.6, and well over a year after Vnue had paid all the notes back in full, *see id.* ¶¶ 53–56, Vnue claims a right to take it all back. Vnue does not allege fraud, surprise, or mistake, or even suggest that its CEO and directors were not fully aware of every term they signed (in July 2018)—and then re-signed, over and over again six more times (through August 2019)—as they raised over a quarter-million dollars in cash from Power Up Lending. *See id.* at 3 n.6. Instead, Vnue alleges that Power Up Lending's "general business model" is that of a securities "dealer," *id.* at 5 (capitalization altered)—because the borrower has the discretion to repay the loans in stock—but that Power Up Lending has never been "registered as a securities dealer," *id.* ¶ 16. So, Vnue says, all of Power Up Lending's transactions are "void and subject to rescission," *see id.* at 27—no matter how old they are, or how irrelevant "dealer" registration is to them. Vnue is wrong.

## A.    Vnue's Securities-Law Claims Are Time-Barred.

Counts I, II, and III are plainly time-barred. Vnue claims an implied private right of action under Section 29(b) of the Exchange Act to "void" and rescind the agreements for an alleged violation of the broker-dealer registration requirements. *See* Compl. at 27–29 (quoting 15 U.S.C. § 78cc(b)).

December 10, 2021
Page 2

There is no "*express* limitation [period] for the rescission of a transaction for [an alleged] violation of . . . the broker-dealer registration requirements." *Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942, 946–47 (N.D. Ill. 2001) (emphasis added).  So the Court must borrow one.  *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 146 (1987).  "[O]rdinarily," a court would turn to the "most closely analogous statute of limitations under state law"—but not always.  *Id.*  Where, as here, a cause of action is implied under the Exchange Act, the Court must borrow the "1-and-3-year structure in the [Exchange] Act's original remedial provisions."  *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 361 (1991); *see, e.g.*, *Spier v. Erber*, 1992 WL 230254, at *13 (S.D.N.Y. Sept. 1, 1992).  That is what every court to consider the question in the context of this case has done.  *See, e.g.*, *Celsion*, 157 F. Supp. 2d at 947.[1]

The one-year limitations period is dispositive here.  Vnue had one year from "discovery of the facts constituting the violation" to bring this case, but it did not.  *Lampf*, 501 U.S. at 363.  The one-year clock started to run, not when Vnue claims to have "first kn[own]" of the alleged violation, but when, "with due diligence," Vnue "should [have] know[n]" of the facts that "form the basis for" the violation.  *Merck & Co. v. Reynolds*, 559 U.S. 633, 646 (2010) (emphasis altered).  That was—at the absolute latest—August 2, 2019, the day that Vnue entered into the seventh and final transaction.  *See* Compl. at 3 n.6.  At that time, Vnue could "easily" have "discover[ed]" that Power Up Lending was not "register[ed] with the SEC" as a dealer by "looking at the Financial Industry Regulatory Authority's (FINRA) website," which lists every registered dealer (https://brokercheck.finra.org/).  *Weiss*, 2011 WL 4538459, at *2; *cf.* Compl. ¶ 16 (citing this exact database).  That Vnue did not conduct this simple search for more than two years is fatal to its case.  It is now out of time.

### B.  General Equitable Principles Preclude Recovery In Any Event.

Two equitable principles independently bar any recovery here.  *First*, when a party sues to rescind an agreement under Section 29(b), "the normal [equitable] defenses come into operation."  *Royal Air Props., Inc. v. Smith*, 312 F.2d 210, 213 (9th Cir. 1962).  Here, equitable estoppel is readily "clear from the face of the complaint."  *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000).  Vnue cannot seriously dispute that its actions led Power Up Lending to believe that Vnue intended to "keep" the agreements in place.  *Royal Air*, 312 F.2d at 213.  *Second*, Power Up Lending "has done the work promised."  *Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 564 (5th Cir. 1982).  It delivered every cent Vnue bargained to borrow, and thus, "unlicensed" or not, Power Up Lending was "not unjustly enriched" when Vnue "paid" what the contracts required.  *Id.*  In these circumstances, no rescission is available.  *See id.* (so holding under Section 29(b)).

### C.  Vnue Is Wrong On The Merits.

**1.**  Vnue misreads 14 words in the Exchange Act—"engaged in the business of buying and selling securities . . . for such person's own account."  15 U.S.C. § 78c(a)(5)(A).  According to Vnue, this

---

[1] *See also Alpha Cap. Anstalt v. Oxysure Sys.*, 216 F. Supp. 3d 403, 408 (S.D.N.Y. 2016); *Weiss v. Altholtz*, 2011 WL 4538459, at *2 (N.D. Ill. Sept. 29, 2011); *Obstfeld v. Thermo Niton Analyzers*, 969 N.Y.S.2d 516, 517 (2d Dep't 2013).

phrase means that *literally* "[a]ny person engaged in the business of buying and selling securities" is a securities "dealer," Compl. ¶ 72—an interpretation that would render unlawful every transaction of nearly every hedge fund, investment company, and family office for almost a century. The problem with Vnue's theory, absurdity aside, is that it fails to consider how a reasonable person would have interpreted the Exchange Act's text "at the time of the Act's adoption." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). On that question, there is no doubt.

For over a century, when investors have wanted to buy or sell a security, they have turned to "brokers" or "dealers" to effectuate the transaction. *See, e.g.*, *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020) ("Broker-dealers effect securities transactions for customers"). In 1934, as today, a "broker" buys and sells securities "*for*" his customer, whereas a dealer buys and sells securities "*from*" and "*to*" his customer. C.H. Meyer, Law of Stock Brokers and Stock Exchanges § 43-a, at 32–34 (1933). As a matter of ordinary parlance, this distinction has been expressed in terms of whose "account" facilitates the customer's trade. A broker trades "for the account of the customer," SEC, *Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker*, at XIV (1936): "We have this day bought (or sold) *for your account* and risk." *E.g.*, *Weisbrod v. Lowitz*, 282 Ill. App. 252, 255 (1935) (emphasis added). A dealer executes the trade by taking the opposite side in "his own account." *Id.*

Congress adopted this language in the Exchange Act, in back-to-back sentences that have not materially changed for 90 years: "The term 'broker' means any person engaged in the business of effecting transactions in securities for the account of others," while the "term 'dealer' means any person engaged in the business of buying and selling securities for his own account." § 3(a), 48 Stat. 881, 883 (codified as amended at 15 U.S.C. § 78c(a)(4), (5)). Properly read, both sentences, appearing side-by-side, and employing related, well-known terms-of-art, "refer to different forms of generally similar" things, *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274 (2013)—the two methods of effectuating a customer's securities order. Power Up Lending does nothing of the sort.

Vnue's allegation that Power Up Lending "avoid[ed] important regulatory obligations" by not registering as a dealer, Compl. ¶ 68, underscores Vnue's error. Those "obligations" are entirely premised on the existence of investor customers, and Vnue does not (and cannot) say why Congress would have forced firms such as Power Up Lending to send "notice[s] to [their] customers" (which they do not have), 15 U.S.C. § 78o(e); to meet "financial responsibility requirements" to keep "custody . . . of customers' securities" (which they do not hold), *id.* § 78o(c)(3)(A); and to join a fund to insure "each of [their] customers' accounts (which do not exist), *id.* § 78fff-4(c).

**2.** Regardless, even if Power Up Lending *were* a dealer, the Exchange Act *still* does not void the purchase or conversion of a convertible note—as every court to consider the issue in this Circuit has held. *See EMA Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81–83 (S.D.N.Y. 2020) (collecting cases).

**3.** Vnue's control-person liability and unjust enrichment claims cannot save its case, as both claims are duplicative of Vnue's Section 29(b) "voidness" argument, which fails for the reasons discussed.

**GIBSON DUNN**

Respectfully submitted,

*/s/ Helgi C. Walker*

Helgi C. Walker (*pro hac vice*)

cc:  All counsel of record (via ECF)