Gustave P. Passanante, Esq.
**THE BASILE LAW FIRM P.C.**
**390 North Broadway, Suite 140**
**Jericho, NY 11753**
**Tel.:    (516) 455-1500**
**Fax:    (631) 498-0748**
**Email: gus@thebasilelawfirm.com**

*Attorneys for Plaintiff VNUE, Inc.*


**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **VNUE, INC.,** | |
| **Plaintiff,** | **AMENDED COMPLAINT** |
| **v.** | **CIVIL ACTION NO. 2:21-cv-05545** |
| **POWER UP LENDING GROUP, LTD. and CURT KRAMER,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff VNUE, Inc. ("VNUE" or "Plaintiff"), through undersigned counsel, states as follows for its Amended Complaint against Defendant Power Up Lending Group Ltd. ("Power Up") and Defendant Curt Kramer ("Kramer") (collectively "Defendants").

## PRELIMINARY STATEMENT

1.      Power Up is a "death spiral" or "toxic" lender:[1] an unregistered securities dealer that engages in convertible market adjustable securities transactions with small public companies—businesses that are often struggling to raise capital.[2] Toxic lenders like Power Up are not the savior of microcaps that they purport to be, nor is their business model legal because they

---

[1]    For the SEC's description and warning in regard to market adjustable securities, *see* https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities (last accessed January 25, 2022); https://en.wikipedia.org/wiki/Death_spiral_financing (last accessed January 25, 2022).

[2]    A review of filings in the EDGAR database from June 16, 2015 to date, Power Up has purchased and sold securities similar to the transactions in this case on at least **934** separate occasions with at least **148** other microcap companies, resulting in the acquisition and sale of at least **5,284,688,117** shares, worth tens of millions of dollars.

are an unregistered dealer.  Rather, as reflected in recent Securities and Exchange Commission ("SEC") prosecutions,[3] lenders like Power Up avoid registering so they can evade regulatory oversight and thereby make predatory loans that generate outrageous profits.

2.    The toxic lending business model is simple:  unlike an investor or day trader, the lender uses the loan transaction to acquire the company's stock at a steep discount (on top of the formal loan interest), which it then dumps into the public markets as soon as possible, invariably causing a sharp plunge in the stock price.

3.    Because convertible securities using a fixed discount can lead to dramatic stock price reductions and corresponding negative effects on both the company and its shareholders, convertible security financings like those used by Power Up are often referred to as "toxic," or "death spiral" loans.

4.    From at least 2015 through the present, Kramer and Power Up[4] bought and sold billions of newly-issued shares of microcap securities (*i.e.*, penny stocks)—and generated millions of dollars from those sales—but failed to comply with the mandatory dealer registration requirements of federal securities laws.

5.    Indeed, from just June 2015 through September 2021, Defendants converted and sold over 5.2 billion shares of stock, generating tens of millions of dollars in gross stock sale proceeds, with many other securities transactions through convertible notes and other market adjustable securities still outstanding.

---

[3]    *See, e.g., SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020); *SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *Securities and Exchange Commission v. Fife*, No. 1:20-cv-05227 (N.D. Ill. Dec. 20, 2021).

[4]    Power Up is the primary defendant in this action, but it is well known that Defendant Kramer operates, or operated, several other entities using the same "market adjustable" convertible securities business model.  These entities include: KBM Worldwide, Inc., Vis Vires Group, Inc., Redstart Holdings Corp., Geneva Roth Remark Holdings, Inc., Mazuma Holding Corp., Asher Enterprises, Inc., and Hope Capital, Inc. (collectively "Related Entities").  If the buying and selling activities of these entities were added to Power Up's activities, the numbers would be significantly higher.

6.      By engaging in a regular business of buying convertible notes (which are securities) for their own account and then selling the resulting newly-issued discounted shares of penny stock companies' (also securities) into the public market, Defendants operated as unregistered securities dealers. *See* 15 U.S.C. § 78c(a)(10).

7.      The Agreements[5] in this case are a masterful example of toxic lending. In this case, Power Up acquired an estimated $569,196.31 worth of stock in exchange for seven loans with an aggregate principal value of $289,000.  On a percentage basis, Power Up's combined return was an astonishing ***210% gain***.[6]

8.      The Agreements are patently unlawful, as they were made and subsequently performed in violation of Section 15(a) of the Securities Exchange Act of 1934 (the "Act"). Plaintiff seeks rescission of the Agreements, rescissionary damages equal to the gross proceeds Defendants received from the sale of Plaintiff's stock, less the amounts advanced by Defendants to Plaintiff, attorneys' fees, and any and all other relief that the Court deems just, proper, and in the interest of justice.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Act.

---

[5]     The "Agreements" are the documents executed by VNUE in favor of Power Up evidencing the seven convertible note purchases. Each of the seven Agreements consists of a convertible promissory note ("Note") and a share purchase agreement ("SPA").  Other than dates and amounts loaned, the Agreements appear to be identical, with a one-year maturity date and stated interest of 12% a.p.r.  The Agreements are, more specifically: (1) A July 9, 2018, Agreement for the purchase of a convertible note in the amount of $63,000.00;  ("July 18 Note") **Exhibit 1**; (2) an August 30, 2018, Agreement for the purchase of a convertible note in the amount of $35,000.00 ("August 18 Note") **Exhibit 2**; (3) an October 18, 2018, Agreement for the purchase of a convertible promissory note in the amount of $35,000.00 ("October 18 Note") **Exhibit 3**; (4) a January 17, 2019, Agreement for the purchase of a convertible promissory note in the amount of $35,000.00 ("January 19 Note")  **Exhibit 4**; (5) a March 25, 2019 Agreement for the purchase of a convertible promissory note in the amount of $38,000.00 ("March 19 Note") **Exhibit 5**; (6)  a July 3, 2019, Agreement for the purchase of a convertible promissory note in the amount of $53,000.00 ("July 19 Note")  **Exhibit 6**; and (7) an August 2, 2019, Agreement for the purchase of a convertible promissory note in the amount of $30,000.00 ("August 19 Note")  **Exhibit 7**.
[6]     Based on the difference between the price paid and the fair market value of the shares on the date of conversion.

10.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in this District as Kramer and Power Up operated their business within this District.

## PARTIES

12.     2VNUE is a Nevada corporation with its principal place of business at 104 W. 29th Street, 11th Floor, New York, New York 10001.

13.     VNUE stock trades on the over-the-counter ("OTC") market, where the stocks of early-stage, developing companies—too small for the major exchanges—are traded.

14.     Power Up is a Virginia corporation that maintains its principal place of business at 111 Great Neck Road, Suite 214, Great Neck, NY 11021.

15.     Kramer, upon information and belief, is a resident of the State of New York. Kramer is the Chief Executive Officer of Defendant Power Up, and the signatory on the Agreements in this case.

16.     Kramer was registered as a broker with the Financial Industry Regulatory Authority, Inc. ("FINRA") between January 1998 and July 2002.  His license as a broker was terminated in July 2002.

17.     Relevant databases confirm that neither "Power Up Lending Group, Ltd.", nor Kramer were registered as a securities dealer with the SEC (or a Self-Regulatory Organization, such as FINRA) at all relevant times herein.

## FACTUAL ALLEGATIONS

18.     During the relevant period, Power Up has operated a regular business through which they bought convertible notes—a type of debt security—from small microcap companies in need of cash.  After typically holding the notes for the minimum six-month holding period set forth in SEC Rule 144, Power Up "converts" the debt under notes i.e., it exercises its right under the Agreements to exchange the debt for shares of issuer stock.

19.     Under the Agreements, which are always drafted by Power Up and nearly identical in every transaction with counterparty issuers, Power Up obtains the right to convert the debt into stock at a steep discount to the market price at the time of conversion.  Then, upon conversion, Power up would promptly sell that stock into the market to lock in the profits gained from the discount.

20.     The SEC refers to these convertible notes as "market adjustable" convertible securities, because the price fluctuates with the market–but the discount is guaranteed.

21.     The scope of the illegal business model that violates federal securities laws deployed by Power Up and Kramer is breathtakingly complex, running through several different Related Entities over the course of at least the last 10 years.

### DEFENDANTS' GENERAL BUSINESS MODEL

#### Defendants Solicited Financially-
#### Strapped Issuers in Need of Capital

22.     Defendant Power Up advertises this slogan on their website's landing page: "Business Loans, Fast and Easy."  *See* poweruplending.com.[7]

---

[7]     In addition to toxic lending with convertible securities, Power Up operates a merchant cash advance ("MCA") lending business with small businesses (public and private) that utilizes ACH daily or weekly payments (not stock) to effectuate repayment.  The New York Attorney General has commenced several actions against similar MCA lenders whose transactions have been found to be loans that charge interest rates so excessive as to violate New York's

23.     Upon information and belief, Defendants directly solicited penny stock issuers by cold calling them or meeting with issuer representatives at microcap conferences and investment banking conferences, some of which were sponsored by the Power Up.  Upon information and belief, in these direct issuer solicitations, Power Up typically represented to issuers that it sought to invest in the issuer's stock and explained the benefits of a convertible debt transaction.

24.     Upon information and belief, because the microcap issuers in Power Up's' convertible note contracts were often startup companies with minimal assets and cashflow, these companies usually were unable to obtain more conventional financing.  Therefore, Power Up carefully positioned itselfs to take advantage of these issuer's poor financial conditions and were able to extract extremely high interest rates and other borderline extortious terms.

25.     Upon information and belief, in soliciting issuers for potential convertible note securities transactions, Defendants generally targeted penny stock issuers that had historically large trading volumes—or the potential for large trading volumes—and that were current in their reporting, so that Power Up could easily convert and quickly sell the shares after the required six month holding period.

26.     Upon information and belief, Defendants targeted these microcap issuers with the goal of easily converting and selling into the public market the issuers' shares acquired through the unlawful securities transactions.

27.     Upon information and belief, Power Up actively encouraged issuers to be repeat customers–to borrow more money by sales of more convertible notes to it after the initial purchase, the proceeds of which were oftentimes used to pay off the previous notes.

---

criminal usury laws. *See, e.g.*, *People v. Richmond Capital Group LLC*, Index No. 451368/2020 (N.Y. Sup. Ct. June 2, 2021).

### *Defendants Purchased Convertible Promissory Notes With Favorable Terms in Order to Obtain Shares of Stock*

28.     Upon information and belief, Power Up obtained all of the stock it sold as part of its business directly from the issuers through note conversions, as opposed to purchases in the open market (*i.e.*, like a "trader").[8]

29.     The billions of shares that Power Up obtained through convertible notes were newly-issued, and the later sales of the shares in the market significantly increased both the amount of shares in the hands of the public and the issuers' total number of shares issued and outstanding.

30.     The "market adjustable" nature of these convertible securities insulate the lenders from price fluctuations, but subjects the borrowing microcap companies to considerable risk of ownership dilution and price collapses resulting from Power Up's selling of large blocks of shares that are often obtained from conversion.

31.     Selling into the public market large quantities of newly-issued shares obtained directly from issuers is a common hallmark of a securities dealer.

32.     In addition to profiting from stock sales, Power Up's' convertible note contracts contained additional unexplained charges such as a 10% Original Issue Discount or "OID," which was subtracted from the principal loan amount conveyed to the issuers.

33.     Power Up charged counterparty issuers "transactional" or "due diligence" fees for entering into the agreements, generally ranging from $3,000.00 to $5,000.00 for a single note.

### *Defendants Converted Promissory Note Debt Into Stock at a Substantial Discount*

---

[8]     The trader exception refers to the registration exemption provided by § 3(a)(5)(B) of the Act, which states that that a "dealer" is not "a person that buys or sells securities … for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business." 15 U.S.C. § 78c(a)(5)(B).  Further distinguishing a dealer from a trader:  dealers often acquire stock directly from the issuer, while traders purchase stock already in the marketplace.  *See SEC v. River North*, 415 F.Supp.3d 853, 859 (N.D. Ill. 2019).

34.     SEC Rule 144, a safe harbor from the statutory definition of an underwriter, was adopted to establish criteria for determining whether a person was engaged in the distribution of securities.  Under Rule 144, non-affiliates who acquire restricted stock directly or indirectly from the issuer in a private transaction may be able to resell it free of restriction into the market after observing a holding period.  *See* 17 C.F.R. § 210.144.

35.     Under Rule 144, unaffiliated parties that are not underwriters may "tack" the six month holding period when one security (convertible note) is exchanged for another security (common stock of an issuer).  *See* 17 C.F.R. § 210.144(d)(3)(ii).

36.     Upon information and belief, Power Up timed its conversions and sales in an effort to comply with the holding period under Rule 144.  For that reason, Power Up generally waited six months (the minimum Rule 144 holding period for securities issued by SEC-reporting companies) after purchasing a convertible note before it began to convert the note to newly-issued stock and then sell that stock into the public market.

37.     The convertible notes that Power Up bought from the issuers allowed Power Up to acquire billions of shares of issuer stock at a substantial discount to the market price—typically requiring a discounted price pegged at between 38 to 45 percent below the "average low" price paid for an issuer's common stock during the 15 days preceding the date of the conversion.

38.     Power Up's convertible note contracts imposed additional and various default penalties such as a default interest rate of 50%, added principal, or daily fees.  Issuers would be in default for a multitude of infractions such as failure to honor a conversion request, failure to keep current in SEC reporting, cross-defaulting on any other notes, and, ironically, for "breach of representations and warranties" and failure to comply with the 1934 Act.

39.     Power Up's notes also contained onerous prepayment provisions that discouraged the microcap issuer from paying off the notes ahead of schedule. The provisions imposed a "prepayment percentage" which, depending on the date of repayment, constituted interest charges in the hundreds of percent a.p.r..

40.     Power Up's notes only permitted prepayment for the first 180 days. After day 180, Power Up was free to convert the debt without interference.

41.      The 180-day prepayment period coincides with the six-month restriction period set forth in Rule 144. Given the Rule 144 restriction on sales for six months, Power Up would have no desire to effectuate conversion during the first 180 days, because conversion would yield only restricted stock. Instead, Power Up held only the debt.

42.     After holding the convertible debt for the applicable 180-day holding period under Rule 144, Power Up began effectuating conversions of the debt. Power Up did this by sending conversion notices to the issuers and their transfer agents, identifying the amount to be converted and the corresponding shares to be received by Power Up.

43.     Upon information and belief, instead of converting all of the debt into stock all at once, Power Up almost always converted in multiple tranches, which would be sold into the market before the next conversion. This insulated Power Up from price depressions caused by their own selling, because the next tranche would be converted at the same discount to the (now lower) market price.

44.     The conversion and sale of stock in tranches also facilitated Power Up's requirement (*see* Notes at 1.1) that it avoid owning more than five percent of any class of an issuer's publicly traded stock at any one time. Far from an investment strategy, the purpose of this

requirement was simply to avoid the requirement to file a "beneficial ownership report" (SEC Schedule 13D) with the SEC).

45.     Upon information and belief, Power Up arranged for the converted stock to be transferred to Power Up's brokerage accounts as quickly as possible, including often paying rush fees to expedite the process.  As part of this process, Power Up obtained rather elusive and oftentimes inaccurate attorney opinion letters to assure brokerage firms that the converted stock was not restricted and could be resold to the public.

### Power Up Sold the Converted Stock Into the Public Market

46.     Once brokers deposit the converted shares from the issuers into the Power Up's brokerage accounts, upon information and belief, Power Up usually begin selling the shares into the public market immediately to lock in their profits.

47.     Kramer personally, or through an affiliated person, entity or independent contractor acting at his direction, used the telephone and the internet to place sell orders on behalf of Power Up.  Sales were made through brokers.

48.     Power Up generally only converted (and sold) only as much stock as the market would bear, typically staggering its sales over a period of time instead of all at once.

49.     Upon conversion, Power Up's practice was to sell the conversion shares acquired in a conversion continuously — on a daily or near-daily basis — until the shares from that tranche were completely sold into the market.

### Power Up Earns Significant Profits from
### Selling  Stock it Obtained at a Discount

50.     Upon information and belief, Power Up profited substantially from their unregistered dealer activity.  Power Up's' profits came from reaping the difference between the deeply-discounted prices at which they acquired shares from the issuers and the market price at

which they were sold– rather than from any appreciation in the stock's price.  Profiting from the spread or markup on the stock is typical of an underwriter and securities dealer.

51.     From June 2015 through September 2021, Power Up purchased more than *612 convertible promissory notes* from approximately *148 different penny stock issuers and sold more than 5.2 billion newly-issued shares of stock* obtained from those notes into the public market for Power Up's own account.

52.     The following are examples of transactions during the relevant period in which Power Up acquired convertible notes from microcap issuers, exercised its conversion rights, and, upon information and belief, sold the resulting newly-issued stock into the market for a significant profit:

     a.  Grow Solutions Holdings, Inc. (GRSO): Power Up purchased a convertible note in the amount of $125,000.00, which they converted into *more than 41,747,801 shares*, with an estimated fair market value of *$495,937.82*;

     b.  Phi Group, Inc. (PHIL): Power Up purchased convertible notes in the amount of $462,500.00, which they converted into *more than 2,282,230,845 shares*, with an estimated fair market value of *$969,317.66*; and

     c.  Probility Media Corp. (PBYA): Power Up purchased a convertible note amount of $158,000.00, which they converted into *more than 784,683,333 shares*, with an estimated fair market value of *$241,236.67*.

53.     In addition to the above purchases and sales of securities, Power Up has engaged in *no less than 931* additional securities purchases and sales, with *no less than 145* additional issuers since June 2015.

54.     Upon information and belief, Power Up used the proceeds from the sales of the shares to fund their regular business of purchasing additional convertible promissory notes.

### Power Up Continues to Convert
### and Sell Shares of Stock

55.     In just the first eight months of 2021 (through September 2021), publicly filed records show that Power Up purchased no fewer than 48 convertible notes from no fewer than 7 issuers, pursuant to which they converted and sold ***372,867,042 shares of stock.***

### DEFENDANTS' BUSINESS MODEL AS APPLIED TO PLAINTIFF

### Power Up Purchased Convertible Notes (Securities) from Plaintiff

56.     The Power Up business model—as reflected in the conduct alleged above—manifests numerous and substantial characteristics of dealer activity, consistent with ongoing SEC prosecutions and other Federal court decisions.

57.     Chief among these characteristics is reaping profits from the purchasing of convertible notes and selling newly-issued securities that would be acquired directly from an issuer through conversion for Power Up's own account.

58.     As defined in the Act, the transactions between Power Up and VNUE in this case are all securities transactions.  As an unregistered dealer, Power Up was not legally permitted to effect transactions in securities; because PowerUp was not legally permitted to enter into the Agreements to begin with, the Agreements are void.  See

59.     Power Up purchased seven convertible promissory notes from VNUE over the span of approximately one year: (1) the July 18 Note; (2) the August 18 Note; (3) the October 18 Note; (4) the January 19 Note; (5) the March 19 Note; (6) the July 19 Note; and (7) the August 19 Note.

60.     As defined under the Act,[9] each of these notes are securities; Power Up effected a transaction in securities when it purchased each Note.

### *Power Up Converted the Notes (Securities) to Stock (Securities) Pursuant to the Notes with Plaintiff*

61.     Starting on January 10, 2019—almost the exact date of the expiration of the Rule 144 holding period for the first note (July 18 Note) on July 9, 2018—Power Up submitted **33** separate conversions under the Notes, pursuant to which Power Up received **619,117,935** newly issued VNUE securities ("Related Transactions").

62.     Each of the conversions is a separate securities transaction.

63.     Pursuant to the 33 conversions, Power Up converted a total of $266,960.00 of debt. The estimated fair market value of the 619,117,935 newly-issued VNUE securities received by Power Up pursuant to the conversions is approximately **$569,196.31**.

64.     As noted above, Power Up timed its conversions and sales in an effort to comply with the holding period under Rule 144 and thereby began converting almost immediately after the expiration of the holding period as follows:[10]

  a.     The July 18 Note:

     i.     on January 10, 2019, Power Up converted $8,000.00 of debt to 4,210,526 shares;

     ii.     on January 15, 2019, Power Up converted $10,000.00 of debt to 5,263,158 shares;

     iii.     on January 18, 2019, Power Up converted $10,010.00 of debt to 5,268,421 shares;

---

[9]     "The term "security" means any note, stock, treasury stock…"  *See* 15 U.S.C. § 78c.
[10]     The August 19 Note was paid back fully in cash, at a 135% prepayment penalty; therefore, there are no notices of conversion on the August 19 Note.

    iv.    on January 23, 2019, Power Up converted $10,535.00 of debt to 5,267,500 shares;

    v.    on January 28, 2019, Power Up converted $10,000.00 of debt to 5,050,505 shares; and

    vi.    on January 29, 2019, Power Up converted $4,025.00 of debt to 3,941,919 shares.

b.    The August 18 Note:

    i.    on March 4, 2019, Power Up converted $13,110.00 of debt to 8,193,750 shares;

    ii.    on March 8, 2019, Power Up converted $11,890.00 of debt to 7,431,250 shares; and

    iii.    on March 11, 2019, Power Up converted $10,000.00 of debt to 7,562,500 shares.

c.    The October 18 Note:

    i.    on April 24, 2019, Power Up converted $11,055.00 of debt to 12,706,897 shares;

    ii.    on May 1, 2019, Power Up converted $9,900.00 of debt to 11,000,000 shares;

    iii.    on May 1, 2019, Power Up converted $12,700.00 of debt to 12,700,000 shares; and

    iv.    on May 2, 2019, Power Up converted $1,345.00 of debt to 3,445,000 shares.

d.    The January 19 Note:

i.      on July 22, 2019, Power Up converted $8,500.00 of debt to 18,478,261 shares;

ii.      on July 25, 2019, Power Up converted $6,500.00 of debt to 18,571,429 shares;

iii.      on July 25, 2019, Power Up converted $6,500.00 of debt to 18,571,429 shares;

iv.      on July 29, 2019, Power Up converted $7,100.00 of debt to 24,285,714 shares;

v.      on July 29, 2019, Power Up converted $6,400.00 of debt to 18,285,714 shares; and

vi.      on July 30, 2019, Power Up converted $700.00 of debt to 2,000,000 shares.

e.      The March 19 Note:

i.      on September 30, 2019, Power Up converted $9,900.00 of debt to 28,285,714 shares;

ii.      on October 1, 2019, Power Up converted $8,200.00 of debt to 28,275,862 shares;

iii.      on October 1, 2019, Power Up converted $8,200.00 of debt to 28,275,862 shares;

iv.      on October 2, 2019, Power Up converted $8,200.00 of debt to 28,275,862 shares; and

v.      on October 4, 2019, Power Up converted $3,500.00 of debt to 25,130,435 shares.

  f.  The July 19 Note:

   i.  on January 9, 2020, Power Up converted $6,500.00 of debt 38,235,294 shares;

   ii.  on January 30, 2020, Power Up converted $6,500.00 of debt to 38,235,294 shares;

   iii.  on January 31, 2020, Power Up converted $6,500.00 of debt to 38,235,294 shares;

   iv.  on February 4, 2020, Power Up converted $5,300.00 of debt to 44,166,667 shares;

   v.  on February 5, 2020, Power Up converted $5,300.00 of debt to 44,166,667 shares;

   vi.  on February 6, 2020, Power Up converted $5,300.00 of debt to 44,166,667 shares;

   vii.  on February 10, 2020, Power Up converted $5,300.00 of debt to 44,166,667 shares;

   viii.  on February 12, 2020, Power Up converted $5,300.00 of debt to 44,166,667 shares; and

   ix.  on February 18, 2020, Power Up converted $2,600.00 of debt to 43,333,333 shares.

### *Power Up Quickly Sold VNUE's Stock Acquired through Conversion*

65. Investment is not part of Power Up's business model.

66. Power Up relied on its conversion discount to maximize profits while it drove down VNUE's trading price due to the liquidation of its sizable positions.

67.     Power Up's business model is similar to the one used by the defendants in *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2016); *SEC v. Almagarby*, 479 F.Supp.3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020); and *Securities and Exchange Commission v. Fife*, No. 1:20-cv-05227 (N.D. Ill. Dec. 20, 2021).

68.     Upon information and belief, as soon as Power Up received the newly-issued VNUE shares, it immediately sold them into the marketplace to reap a substantial profit—even while VNUE's trading price was falling.

69.     Upon information and belief, Power Up is one of the larger and more active sellers of VNUE stock.  For example, in 2019, shortly after expiration of the (Rule 144) six-month holding period under the July 18 Note (the first of seven), Power Up actively sold the converted stock of the Plaintiff.  As the table below shows, Plaintiff's approximate average daily trading volume significantly increased for the days following the date of a conversion, indicating the increased trading volume inevitably occurred due to the massive selling of the shares Power Up acquired through conversion:

| VNUE's Trading Volume Analysis[11] | | | | |
|---|---|---|---|---|
| Average Volume for 30-Day Period Preceding 01/10/2019 Conversion Notice under First Note | Average Volume 10-Day Period Succeeding the 01/10/2019 Notice of Conversion | Average Volume 10-Day Period Succeeding the 01/15/2019 Notice of Conversion | Average Volume 10-Day Period Succeeding the 01/18/2019 Notice of Conversion | Average Volume 10-Day Period Succeeding the 01/23/2019 Notice of Conversion |
| 567,993 | 6,806,470 | 10,565,000 | 12,184,000 | 11,876,000 |

---

[11]   This analysis is based on conversions from the July 18 Note; conversions under the subsequent Notes necessarily caused similar volume increases but those increases are not as apparent.

### As An Unregistered Dealer, Power Up Violated § 15(a) of the Act When It Effected the Transactions in this Case

70.     Power Up's purchases of convertible notes (securities transactions), conversions of debt into stock (securities transactions), and subsequent stock sales (securities transactions) are part of an ongoing business.  Power Up acquires large volumes of shares privately from issuers at a substantial discount to market, sells large volumes of shares back into the open market for substantial profit due to the conversion discount, and always does so absent investment intent. Power Up does all of this, buys, converts, and sells securities, as part of its regular business for its own account.

71.     The SEC's EDGAR database shows that since 2015, Power Up has purchased similar convertible notes on more than 612 occasions, from at least 148 other microcap companies.

72.     Upon information and belief, Power Up paid several independent contractors to assist it in locating, negotiating, and managing Power Up's transactions.

73.     As shown in EDGAR data, Power Up had a regular clientele of issuers from which it would purchase multiple securities, convert at a deep discount (well beyond the 8% that registered underwriters are permitted to charge), and sell newly-issued stock into the market to reap the profits on the markup.

74.     Upon information and belief, Power Up made use of the mails, email, and other instrumentalities of interstate commerce to effect the securities transactions under the Agreements. For example, Power Up used the internet to solicit penny stock issuers and to transfer cash through wire transfers, and used email and telephone communications to negotiate and effectuate sales transactions through their brokers.

75.     By failing to comply with the dealer registration requirements and federal securities laws, Power Up purposefully "operated under the radar" to avoid important regulatory obligations that govern dealer conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.

76.     In light of the difficulty of assessing damages, the equitable remedy of rescission indicated by § 29(b) of the Act, voiding and rescinding the Agreements (to return the parties to their pre-contract position) should be effectuated by mandating Power Up to return to VNUE every share of stock it acquired under the Notes (or the cash equivalent thereof), less a number of shares with a market value equivalent to the net sum provided to Plaintiff for the purchase of the Notes.

77.     VNUE is further entitled to statutory prejudgment interest on the value of the stock and the cash payments.

78.     In the alternative, Power Up should pay rescissionary damages in an amount constituting the full market value of the stock wrongfully acquired and cash amounts received, both with statutory prejudgment interest.

79.     Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC or, in the case of a natural person, associate with a registered dealer. *See* 15 U.S.C. § 78o(a)(1).

80.     Power Up engaged in much (if not all) of the conduct described herein at their Great Neck, New York address in this District.

81.     While Power Up engaged in this conduct, it was not registered with the SEC as dealers or associated with dealers registered with the SEC.

82.     The dealer registration requirements provide important safeguards for the investing public, shareholders and companies.  The excessive compensation and patently unfair terms used in the Agreements (and Power Up's transactions with other issuers) would have violated FINRA Rules 5110(b)(4)(B) and 5110(c)(2)(A), and hence could not have been effected by a registered securities dealer.

83.     SEC registration also requires the dealer to disclose important information about its business, such as the names of the direct and indirect owners and executive officers,  arrangements with other persons or entities, and past criminal or regulatory actions against the dealer.

84.     Power Up's enormous profits from the Agreements resulted from the market prices they received when they sold the stock into the public market, and the deeply discounted price at which it acquired the stock from VNUE.  This mechanism, where Power Up reaps the profits on the spread or markup of the stock they sold, is a common attribute of underwriting activity, which is considered dealer activity.

85.     Registration as a securities dealer and accompanying SEC oversight would mean Power Up could no longer avail itself of the Rule 144 tacking provision (17 C.F.R. 230.144(d)(3)(ii)) because the SEC and FINRA would find out that Power Up's underwriting activity disqualifies it from the Rule 144 exemption.

### Power Up's Repeated Material Misrepresentation
### In the Share Purchase Agreements

86.     In Section 2.a of each of the seven Agreements, Power Up *falsely* "warranted and represented" to Plaintiff that it was purchasing the shares of stock "***not with a present view towards the public sale or distribution thereof, except pursuant to sales registered or exempted from registration under the 1933 Act.***"  *See* SPA at 2.a. (emphasis added).

87.     The Section 2.a representations were demonstrably false and misrepresented the facts.  Power Up's subsequent behavior of immediately selling the 619,117,935 shares of stock into the public market within days after every single one of the 33 conversions demonstrates that, at the time of the conversions, it was indeed acquiring the stock with a view to public sale or distribution thereof, and that it knowingly and intentionally misrepresented that fact in each of the seven Agreements.

### *Power Up Knowingly and Intentionally Misrepresented the Facts*

88.     The fact that Power Up's entire business model is based upon purchases with a view to public distribution further demonstrates that, at the time the Agreements were executed, Power Up knowingly and intentionally misrepresented that the stock was being acquired "not with a present view towards the public sale or distribution thereof."  Power Up's misstatements were made with the purpose of intentionally deceiving VNUE that it was entitled to certain exemptions from restriction under Rule 144, and/ or that it would not be injured by Power Up's selling activities.

89.     Power Up's practice of immediately selling conversion stock as soon as it is acquired comports with its well-known business model, which it has used in thousands of similar securities transactions for nearly a decade.

90.     Power Up's sales of the conversion shares were not made pursuant to registration of the shares under the 1933 Act, nor were they exempted from registration under the 1933 Act.

91.     Power Up sold the 619,117,935 conversion shares into the public market of the United States without registration of those shares in accordance with the 1933 Act.

92.     Under the 1933 Act, "the term 'underwriter' means any person who has purchased from an issuer with a view to . . . the distribution of any security, or participates or has a direct or indirect participation in any such undertaking . . ."  15 U.S.C. § 77b(a)(11).

93.     Under Power Up's business model, Power Up would be considered an underwriter pursuant to 15 U.S.C. § 77b(a)(11) because it acquires stock with a view to distribution.

94.     As an underwriter, Power Up did not qualify for the Rule 144 exemption from registration of the conversion shares under the Act.  17 C.F.R. 230.144.

95.     Defendants were aware at the time of the Agreements that Power Up was acting as an underwriter as that term is defined in the Securities Act of 1933, and it was therefore disqualified from the Rule 144 exemption.

96.     Defendants' failure to register as a securities dealer and contractual requirements that it not hold any more than 4.99% of an issuer's shares at any one time (which must be reported to the SEC) further demonstrates a conscious pattern of avoiding SEC oversight.

97.     As noted above, Power Up used the instrumentalities of interstate commerce such as phone lines and email communications to facilitate the transactions.[12]

### Kramer Controlled Power Up, as well as
### Its Related Entities, in Convertible Debt Businesses

---

[12] As held by the U.S. Court of Appeals for the Third Circuit:

> Although maintaining a private right of action under Section 10(b) requires a plaintiff to prove reliance and damages (usually reflected in the stock's price movement), Section 29(b) only requires a violation of Section 10(b), not the maintenance of a private suit under Section 10(b). Therefore, looking to the statutory language of the anti-fraud provision, we note that an individual violates Section 10(b) -- and therefore triggers Section 29(b) -- when he or she employs manipulative or deceptive devices in connection with the purchase or sale of securities. This situation is analogous to a government prosecution under Section 10(b), in which the government is not required to meet the normal standing requirements imposed on those asserting a private remedy, inasmuch as the government need not demonstrate that the defendant's conduct induced reliance by investors or affected the price of the security.

*GFL Advantage Fund, Ltd., v. Colkitt*, 272 F.3d 189, n. 6 (3d. Cir.  2001).

98.     At all relevant times, Kramer possessed and exercised the ultimate decision-making and control over Power Up, including the power to decide whether to enter into each of the securities transactions (including the Notes with Plaintiff), to negotiate and approve the final deal terms, and to monitor the status of Power Up's investments and its sales of stock.

99.     Kramer, as the Manager of Power Up, had sole and exclusive control and final decision-making authority over Power Up.

100.    Kramer personally, or others employed by Power Up, at Kramer's direction, negotiated the terms of the convertible notes that Power Up purchased from penny stock issuers (including the Notes with Plaintiff).  Kramer also signed the contracts by which Power Up acquired the convertible notes, including all Notes with Plaintiff.

101.    In addition to Power Up, Kramer has been involved with numerous Related Entities in an authoritative capacity, all of which engage in eerily similar, although not exactly the same, unlawful securities transactions as Power Up.[13]

102.    Kramer, based on his previous experience as a registered broker, knew Power Up was required to register as a dealer due to its dealer activity and intentionally decided not to direct Power Up to register as a Dealer.

103.    Ultimately, Kramer was and remains the sole person with the power to direct, authorize, and compel Power Up to enter into, convert, and subsequently sell securities through convertible notes with issuers, including the Notes with VNUE.

---

[13]    From December 2008 to May 2009, Kramer and Hope Capital, Inc. purchased over 113.5 million shares of a single microcap issuer, which it had obtained at a significant discount to the market price, and sold the shares in U.S. public markets within days or a few weeks of the purchase.  In 2013, the SEC charged Kramer and Mazuma Holding Corp. with violating the federal securities laws, including Rule 504.  Kramer purchased unregistered shares directly from a penny stock issuer at a substantial discount to the market price. On November 25, 2013 the SEC issued a cease and desist order against Kramer and Mazuma, and ordered disgorgement of profits of more than $1.7 million.  On October 27, 2016, the SEC ordered Curt Kramer and Hope Capital, Inc. to cease and desist from violating the Securities Act of 1933.

## CAUSES OF ACTION

### COUNT I:

### *Seeking Rescission of the Agreements Pursuant to § 29(b)*
### *Of the Act for Violation of § 15(a) the Act by Power Up for*
### <u>*Making*</u> *the Agreements as an Unregistered Securities Dealer*
### *(Against Power Up)*

104.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

105.    Section 29(b) of the Exchange Act provides in relevant part that:

> ***Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder … shall be void*** (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or … engaged in the performance of any such contract***…***

15 U.S.C. § 78cc(b) (emphasis added).

106.    The Agreements were made in violation of Section 15(a) of the Act, which prohibits unregistered dealers from using any means of interstate commerce to effect transactions in securities.

107.    Power Up is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

108.    Power Up is not registered as a dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act.

109.    Power Up effected transactions in securities via the Agreements and in the Related Transactions.

110.    Power Up used the means of interstate commerce to effectuate the Agreements and in the Related Transactions.

111.    As a party to the Agreements and the Related Transactions, VNUE is in contractual privity with Power Up.

112.    The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, VNUE, as an issuer, is within the class of persons that the Act was designed to protect.

113.    Because Power Up effected the Agreements and in the Related Transactions in securities as an unregistered dealer, and utilized the means of interstate commerce in connection therewith, the Agreements were unlawful when made.

**COUNT II:**

*Seeking Rescission of the Agreements Pursuant to § 29(b) of*
*The Act for Violation of Section 15(a) the Act by Power Up for*
*<u>Performing</u> the Agreements as an Unregistered Securities Dealer*
*(Against Power Up)*

114.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

115.    Section 29(b) of the Exchange Act provides in relevant part that:

> ***Every contract …*** (including any contract for listing a security on an exchange) heretofore or hereafter made, ***the performance of which involves the violation of***, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, ***shall be void*** (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or  … engaged in the performance of any such contract… ***Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore*** or hereafter made, ***… shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made… any such contract…***

15 U.S.C. § 78cc(b) (emphasis added).

116.     The Agreements were performed in violation of Section 15(a) of the Act, which prohibits unregistered dealers from using any means of interstate commerce to effect transactions in securities.

117.     Power Up is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

118.     Power Up is not registered as a dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act.

119.     Power Up effected transactions in securities via the Agreements and in the Related Transactions.

120.     Power Up used the means of interstate commerce to effectuate the Agreements and the Related Transactions.

121.     As a party to the Agreements and the Related Transactions, VNUE is in contractual privity with Power Up.

122.     The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, VNUE, as an issuer, is within the class of persons that the Act was designed to protect.

123.     Because Power Up effected the Agreements and the Related Transactions in securities as an unregistered dealer, and utilized the means of interstate commerce in connection therewith, the Agreements were unlawful when performed (via the conversions).

### COUNT III:

***Seeking Rescission of the Agreements Pursuant to § 29(b) of the
Act for Violation of Section 10(b) of the Act by Power Up for
Intentional Material Misstatements in Purchasing the Securities
(Against Power Up)***

124.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior paragraphs as though set forth herein.

125.     Section 29(b) of the Exchange Act provides in relevant part that:

> ***Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder ... shall be void*** (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or ... engaged in the performance of any such contract**...**

15 U.S.C. § 78cc(b) (emphasis added).

126.     Under § 10(b) of the Act;

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

127.     In connection with the purchase of the convertible securities in this case, Power Up knowingly "warranted and represented" in the Agreements that it was not acquiring VNUE stock with a view to distribution of such stock.  *See* SPAs (Exhs. 1-7) at ¶ 2.a

128.     In connection with the purchase of the convertible securities in this case, Power Up knowingly "warranted and represented" in the Agreements that its subsequent sale of the stock would be via registration or an exemption from registration under the 1933 Act.  *See* SPA (Exh.'s 1-7) at ¶ 2.a

129.     Power Up's' repeated statements in section 2.a were patently false, and were known to be false by Defendants at the time the Agreements were executed, and at the time that the debt was converted into stock.

130.     Power Up knowingly made false statements with an intent to deceive VNUE when it made false warranties and representations in Section 2.a.  Power Up' demonstrated that it  had no intention to abide by the warranty statements is evident from its repeated conduct of immediately selling the stock into the public market after acquisition.  Such activity  shows that Power Up acquired the stock precisely for the purpose of distribution into the public markets.

131.     Power Up's intent to deceive, and knowledge that the Section 2.a statements were false when made is demonstrated by the fact that its entire business model is based upon immediate sales of stock into the public market, i.e., with a view to distribution.

132.     Power Up's sale with a view to distribution disqualified it from the Rule 144 exemption, and Power Up's use of that provision would be unlawful.

133.     Power Up's false statements that it would comport with the laws and regulations governing the transaction are per se material to the agreements.

134.     Power Up's intention to unlawfully act as an underwriter by selling the shares into the open market is material to the agreements, because VNUE would be damaged by massive unlawful dumping of stock into the market.

**COUNT IV:**

***Violation of Section 20(a) the Act by Kramer as a***
***Control Person of Power Up Based on Power Up's***
***Violations of Sections 15(a) And  10(b) of the Act***
***(Against Kramer)***

135.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior paragraphs as though set forth herein.

136.     Kramer had the power and authority to cause Power Up to engage in the wrongful conduct described in Counts I, II, and III herein.

137.    Kramer did in fact cause Power Up to engage in the wrongful conduct described herein in paragraphs 1 through 103 (including Counts I, II, and III).

138.    Kramer did not act in good faith.

139.    Kramer directly and/or indirectly induced the acts and conduct that constitute the violations in this case.

140.    Therefore, Kramer acted as a control person of Power Up within the meaning of § 20(a) of the Act.

## COUNT V:

### *Unjust Enrichment*
### *(Against All Defendants)*

141.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

142.    The Defendants have received valuable benefits from VNUE, including, *inter alia*, the stock and profits realized from the sale of the unlawfully issued shares of VNUE common stock.

143.    These benefits are the result of the wrongful conduct alleged herein in Counts I-III.

144.    The Defendants have unjustly retained these benefits at VNUE's and its stockholders' expense.

145.    As a result, the Defendants have been unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff VNUE seeks a Verdict and Judgment against the Defendants herein as follows:

A.    Count I (Against Power Up)

    a.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201,

VNUE requests the Court to declare that:

    i.    the Agreements and Related Transactions are transactions in securities within the meaning set forth in the Act;

    ii.    Power Up is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

    iii.    the Agreements are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

    iv.    Power Up is entitled to retain the principal amount of the loans made pursuant to Agreements, already repaid by VNUE.

b.    VNUE requests that the Court enter an Order:

    i.    rescinding the Agreements pursuant to the Act (15 U.S.C. § 78cc);

    ii.    awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

    iii.    requiring Power Up to return to VNUE all VNUE stock obtained via the Agreements;

    iv.    awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

B.    Count II (Against Power Up)

a.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

    i.    the Agreements and Related Transactions are transactions in securities within the meaning set forth in the Act (15 U.S.C. §

78c(a));

ii.   Power Up is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

iii.   the Agreements are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

iv.   Power Up is entitled to retain the principal amount of the loans made pursuant to Agreements, already repaid by VNUE.

b.   VNUE requests that the Court enter an Order:

i.   rescinding the Agreements pursuant to the Act (15 U.S.C. § 78cc);

ii.   awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

iii.   requiring Power Up to return to VNUE all VNUE stock obtained via the Agreements; and

iv.   awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

C.   Count III (Against Power Up)

a.   Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

i.   the Agreements contain material misrepresentations by Defendant in connection with that sale of the security effectuated by the Agreements, in violation of section 10(b) of the Act;

ii.   the Agreements are void and subject to rescission under the section

29(b) of the Act (15 U.S.C. § 78cc); and

  iii.  Power Up is entitled to retain the principal amount of the loans made pursuant to Agreements, already repaid by VNUE.

 b. VNUE requests that the Court enter an Order:

  i.  rescinding the Agreements pursuant to the Act (15 U.S.C. § 78cc);

  ii.  awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

  iii.  requiring Power Up to return to VNUE all VNUE stock obtained via the Agreements; and

  iv.  awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

D. Count IV (Against Kramer)

 a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

  i.  Kramer had the power and authority to cause Power Up to engage in the wrongful conduct described in Counts I and II herein;

  ii.  Kramer did in fact cause Power Up to engage in the wrongful conduct described in Counts I, II, and III herein; and

  iii.  Kramer acted as a control person of Power Up within the meaning of Section 20(a) of the Act.

 b. VNUE requests that the court enter an Order, pursuant to Section 20(a) of the Act, holding Kramer jointly and severally liable with and to the same

extent as Power Up is liable to VNUE under Counts I, II, III, and/or V herein.

E.    Count V (Against all Defendants)

    a.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

        i.    Defendants have voluntarily accepted and retained the property conferred by Power Up on the Defendants through and as a result of violations of the Act (15 U.S.C. § 78o); and

        ii.    the circumstances are such that it would be inequitable for the Defendants to retain the property conferred on them by VNUE without first paying the value thereof to VNUE, to prevent the Defendants from being unjustly enriched.

    b.    VNUE requests that the Court enter an Order requiring the Defendants to return to VNUE the value of the property they have unjustly retained less the value conferred upon the Plaintiff.

F.    As to each of the foregoing Counts I-V, to the extent permitted by applicable law, and not otherwise requested, VNUE requests that the Court enter an Order:

    a.    awarding VNUE compensatory, direct, and consequential damages;

    b.    awarding VNUE punitive and/or treble damages, to deter the Defendants from continuing to engage in the same wrongful and unlawful transactions;

    c.    awarding VNUE its attorneys' fees and costs associated with this litigation;

    d.    entering an award of monetary damages jointly and severally against the Defendants; and

e.      awarding such further and additional legal and equitable relief that the Court

deems just, proper, and in the interest of justice.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues properly so tried.


DATED:        January 26, 2022                    Respectfully Submitted,


*/s/ Gustave P. Passanante*
Gustave P. Passanante, Esq.
**THE BASILE LAW FIRM P.C.**
390 North Broadway, Suite 140
Jericho, NY 11753
Tel.:    (516) 455-1500
Fax:     (631) 498-0748
Email:  gus@thebasilelawfirm.com

***Attorneys for Plaintiff VNUE, Inc.***